NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-308

AARON ROMERO, ET. AL.

VERSUS

ALLIED DISCOUNT TIRE & BRAKE, INC., ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2015-5335
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

D. KENT SAVOIE
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Jonathan W. Perry, and Gary J. Ortego, Judges.

AFFIRMED.

Chuck David Granger
Granger Law Firm
P. O. Drawer 1849
130 W. Vine Street
Opelousas, LA 70570
(337) 948-5000
COUNSEL FOR PLAINTIFFS/APPELLANT:S
  Aaron Romero
  Aaron Romero o/b/o Madison Romero
  Lauren F. Romero
  Aaron Romero o/b/o Blakely Romero

Gregory A. Koury
Koury & Hill, LLC
P. O. Box 52025
Lafayette, LA 70505-2025
(337) 993-1842
COUNSEL FOR PLAINTIFF/APPELLANT:
  Lauren F. Romero
  Aaron Romero o/b/o Madison Romero
  Lauren F. Romero
  Aaron Romero o/b/o Blakely Romero

Raymond Paul Augustin, Jr.
Mickey S. deLaup
Travis J. Beslin
deLaup & Sticker, APLC
2701 Metairie Road
Metairie, LA 70001
(504) 828-2277
COUNSEL FOR DEFENDANTS/APPELLEES:
  Allied Discount Tire & Brake, Inc.
  Quentin Phillips
  Liberty Surplus Insurance Company

James Thomas Rivera
Jessica W. Marchand
Scofield & Rivera, LLC
P. O. Box 4422
Lafayette, LA 70502
(337) 235-5353
COUNSEL FOR DEFENDANT/APPELLEE:
  Allied Discount Tire & Brake, Inc.
  Quentin Phillips
  Houston Specialty Insurance Company

D. Russell Holwadel
Phillip Joseph Rew
Richard R. Stedman, II

**Adam Hoefer Holwadel**
**Kevin F. Truxillo**
**Heather E. Reznik**
**Adams, Hoefer, Holwadel, LLC**
**400 Poydras St., Ste 2450**
**New Orleans, LA 70130**
**(504) 581-2606**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Liberty Surplus Insurance Company**

**Megan M. Richardson**
**Mickey S.DeLaup, APLC**
**2701 Metairie Road**
**Metairie, LA 70001**
**(504) 828-2277**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Liberty Surplus Insurance Company**

**Theodore Michael Haik, Jr.**
**Haik, Minvielle & Grubbs**
**P. O. Box 11040**
**New Iberia, LA 70562-1040**
**(337) 365-5486**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Our Lady of Lourdes Regional Medical Center**

**SAVOIE, Judge.**

In this single vehicle accident case involving a wheel separation, Plaintiffs appeal the jury's verdict finding no liability on the part of Defendants. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Aaron Romero (Romero) purchased a new 2013 Dodge Ram ¾ ton pickup truck in August 2013. In April 2014, after the expiration of the 36,000 mile warranty, Romero had a six-inch lift, larger rims, and larger tires installed on his truck. Unbeknownst to Romero at the time, the tire shop which installed the tires, and which is not a party to this litigation, secured the tires using 9/16-inch lug nuts when the truck had 14-millimeter metric studs.

On October 30, 2014, Romero noticed a "bulge" or "egg" in the front left tire, and had it replaced with a used tire. However, when driving on this replacement tire, he noticed that it was "shimmying." Therefore, on October 31, 2014, Romero brought his truck to Allied Discount Tire & Brake, Inc. (Allied), where, upon Romero's request, an Allied employee, Quentin Phillps (Phillips), removed, balanced, and reinstalled the front left tire on Romero's truck. Romero then left Allied, and about six and a half miles down the road, that same tire came off the truck, and Romero crashed into a bridge.

On October 27, 2015, Romero, individually and on behalf of his two minor children, as well as Romero's wife Lauren, filed suit against Allied and Houston Specialty Insurance Company, alleging that Allied was negligent in its installation of the rim and tire, and that Romero suffered significant injuries and damages as a result of the accident. Plaintiffs filed an amended petition on April 18, 2019, naming Phillips and Liberty Surplus Insurance Company as Defendants.

A two-week jury trial was held April 19, 2021, through April 30, 2021. The trial court rendered a judgment in accordance with the jury's verdict that found no liability on the part of Defendants' and dismissed Plaintiffs' claims. The trial court subsequently denied Plaintiffs' motions for judgment notwithstanding the verdict (JNOV) and for new trial.

Plaintiffs appeal and assert the following as assignments of error:

1. The jury manifestly erred in finding no fault on the part of defendants, Allied Discount Tire & Brake, Inc. and Quentin Phillips, despite overwhelming evidence on the liability issue.

2. The Trial Judge committed legal error in failing to grant Plaintiff's Motion for Judgment Notwithstanding the Verdict or Motion for New Trial.

## ANALYSIS

Plaintiffs' first assignment of error challenges the jury's finding of no liability on the part of the Defendants, given the evidence presented. Plaintiffs contend that Phillips improperly tightened the lug nuts in a "circular" pattern rather than in a "crisscross" pattern in accordance with industry standards, and that this, along with the principle of *res ipsa loquitor* and "common sense," necessitate inferences that Phillips was negligent in installing the tire and that this negligence caused the tire to come off and Romero to crash. Plaintiffs argue that "in 6.5 years and 200,000 miles driven with 9/16 lug nuts, the only rim/tire that Allied Discount Tire touched came completely off within 6.5 miles." Plaintiffs primarily rely on the testimony of their mechanical engineering expert, Jeremy Hoffpauir (Hoffpauir).

Defendants, on the other hand, contend that the mismatch in size between the 9/16-inch lug nuts and the 14-mm studs caused a weakening in the fastening system of the wheel and tire, and this weakened fastening system led to the tire separation and crash at issue. In support of their position, Defendants rely on the testimony of

their mechanical engineering expert, Ashley Al Dunn, P.E., Ph.D (Dunn). Defendants further note that due to the microscopic size difference between the 9/16-inch lug nuts and the 14-mm studs, Phillips did not know, and could not have known, that they did not match, and Plaintiffs have not suggested otherwise.

We review the jury's findings in accordance with the following:

> In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not. . . . Placing the burden of proof on the plaintiff requires him ultimately to persuade the factfinder concerning the defendant's negligence, and if the factfinder is undecided after all the evidence has been presented, the plaintiff loses because of the failure of his evidence.
>
> . . . .
>
> . . . . A reviewing court may not set aside a district court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. . . . [T]he issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether the factfinder's conclusion was a reasonable one.
>
> . . . .
>
> . . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
>
> . . . .
>
> Moreover, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error.

*Hanks v. Entergy Corp.*, 06-477, pp. 19-24 (La. 12/18/06), 944 So.2d 564, 578-581 (internal citations omitted).

Phillips, the Allied employee who balanced Romero's tire the day of the accident, testified at trial. He stated that he had twenty-five years' experience mounting tires and that he had mounted thousands of tires, including tires on big trucks.

In describing the procedure he used to remove, balance, and replace Romero's front left tire on October 31, 2014, Phillips testified that he first jacked up the side of Romero's truck, removed the lug nuts on the tire, took the tire off, and balanced the tire with a computerized balancing machine. He said that he then put the tire back on the wheel by first screwing on the lug nuts by hand, or with a socket, more than halfway onto the studs. He explained that he started off by hand to avoid the risk of cross-threading.

Phillips testified that he then used an impact gun to "snug" the lug nuts. He explained that snugging meant "[n]ot all the way tight, just to make sure they're flush[,]" and he said that he did not use the impact gun to tighten the lug nuts "all the way down."

Phillips testified that after snugging the lug nuts with the impact gun, he used a torque wrench to finish tightening them and torqued the lug nuts to 125-to-150-foot pounds. He explained that the torque wrench applied torque until it clicked, and that it took "just one click" for each lug nut to achieve the desired amount of torque.

On cross-examination, Phillips testified as to the order or pattern he used when securing the eight lug nuts unto the eight studs of the left front wheel. He indicated that when he utilized the impact gun to snug the lug nuts, he went in a circular pattern around the wheel, skipping every other stud, until each lug nut had been snugged.

With respect to the order he used when torquing the lug nuts with the torque wrench, Phillips testified as follows:

A. To torque them . . . . I think I would probably skip . . . two of them.

Q. Wait, say that again.

A. I would probably skip two, if I did it with the torque stick.

. . . .

Q. Okay. And do you know if you went in a clockwise direction or counterclockwise direction?

A. I don't remember exactly, but I mean - -

Q. But you went in a circle?

A. I mean, I did it right.

Phillips was also questioned about his knowledge of and understanding of a "crisscross" pattern, and he testified as follows:

Q. . . . . Have you ever heard of the crisscross pattern?

A. Yes.

. . . .

Q. Okay. And what is it?

A. It's a little chart.

Q. Okay. And the chart would be where?

A. Like on the wall in the shop.

Q. Okay. And did you ever follow the crisscross pattern?

A. Yes, sir.

. . . .

Q. But you did not follow it on Aaron Romero's truck on October 31st, 2014, correct?

A. I don't remember.

5

. . . .

Q. And did Allied Discount Tire train you to use the crisscross pattern to secure lug nuts when using an impact tool?

A. Yes, sir.

On direct examination, Phillips was also questioned by counsel with respect to the pattern or order he used in tightening the eight lug nuts onto the studs:

Q. . . . do you, sitting here today have a specific recollection, a memory of exactly the order in which you tightened the lug nuts on the Dodge pick-up truck?

A. No, sir.

Q. You indicated earlier that you mounted thousands of truck tires, right?

A. Yes, sir.

. . . .

Q. Do you believe that you properly installed the tire on the Dodge truck?

A. Yes, sir.

Phillips also testified at trial that, on the day of the accident, he did not notice any problems with the lug nuts or studs, such as stripped studs or cross-threaded studs, and that he did not feel anything wrong with the lug nuts when tightening them. He also testified that he remembered there was some silicone on the center cap of the front left tire, which could possibly cause the center cap to break if it was removed. Phillips said that when he discovered this, he told his manager, and his manager told him to proceed with balancing the tire because the customer was aware of it. He also testified that he was not aware, on the day of the accident, that the lug nuts were not the same size as the studs.

6

A video of Phillips installing Romero's tire on the day of the accident was also played for the jury and accepted into evidence. Upon review, the video is of poor quality, recorded a considerable distance away from Phillips, and does not show the order in which Phillips secured the lug nuts onto the wheel. Phillips agreed it was him in the video but testified that his identity was not clear from the video.

Hoffpauir, Plaintiffs' expert in mechanical engineering, also testified at trial. He ultimately concluded that it was Allied's/Phillips' installation of the tire, and not the mismatch in size between the lug nuts and studs, that caused Romero's left front tire to come off.

Hoffpauir testified that the industry standard regarding the proper order, or pattern, to tighten the lug nuts on "eight lug" wheels was reflected in a diagram from ALLDATA, which provides equipment manufacturer information to aftermarket shops. Hoffpauir explained that "in this particular diagram, they start at number one, go all the way to the bottom to number two, then back up to the top right, three – and you can follow the numbers in sequence." He also testified that there is a better chance of centering the wheel on the hub by following this "crisscross pattern," and that if one side of the wheel was tightened first, there was a potential for cocking the wheel.

Hoffpauir also testified that tightening the lug nuts in a circular pattern, skipping every other stud, was not recognized in the industry as a proper order in which to torque the lug nuts. He explained that while skipping every other stud in a circular pattern is "a little better[,]" because the "clamping force" is "spread[] out a little further across the hub[,]" "[y]ou are still remaining in the same quadrant, . . . of the wheel flange you're tightening."

Hoffpauir admitted, however, that when tightening the lug nuts in a circle, rather than in a crisscross pattern, "there are times" when it is possible to get the rim flat on the hub, "[b]ut in theory . . . . it's going to make it a lot more difficult to move and typically not move into position."

Hoffpauir testified that he inspected Romero's truck in September 2018[1] and tried to re-create his understanding of what Phillips did when installing Romero's left front tire. He stated that he installed a tire similar to that on Romero's truck at the time of the accident and that he used an impact gun to tighten the lug nuts "in a circular manner." He said he "believed" he skipped every other stud. He testified that he then drove the truck around the parking lot, checked the torque, and none of the lug nuts backed off.

Hoffpauir said that he then took the tire off and installed it again "in a circular pattern[,]" torqued it, and then drove the truck for 2.5 miles. He testified that afterward, five of the eight lug nuts were "so loose that it took . . . two complete rotations to tighten them back up. One of them remained tight. The other two was [sic] less than a rotation of the lug nut to tighten them." He stated that he was not surprised by this result because, when the lug nuts are not tightened in a crisscross pattern, and

> you tightened it misaligned, once the vehicle starts driving, you are going to impart dynamic forces on that wheel, and it's going to shift into position. Once that occurs, then the lug nuts that were not the first one that was torqued are going to be loose.

---

[1] Hoffpauir inspected the vehicle three separate times. The first was in March 2018, where the lug nuts on the right front tire were removed, and Hoffpauir opined that they were able to develop the requisite torque to hold the wheel into place even though there was some reforming of the threads. The second inspection was in September 2018. The third inspection was in July 2020, where the left front tire was removed, examined, and replaced; however, the lug nuts were too tight to remove with a ratchet, and required a "cheater pipe" for removal, and one of the lug nuts was a 14-mm.

That tension disappears because now there is clearance between the lug nut and the flange, and then those lug nuts start backing off. And the lug nuts back off on the left side because of the rotation of the tires. . . . that's the direction your wheels are rolling.

Hoffpauir also indicated that using the properly sized 14-mm lug nuts instead of the mismatched 9/16-inch lug nuts would not have changed the result; however, he testified that he did not test this. According to Hoffpauir, "it all has to do with the misalignment of the rim flange of the hub."

Hoffpauir testified on cross-examination that there was no video of his September 2018 inspection. He also testified that when inspecting Romero's truck, the rim on the left front tire was not the same one that was involved in the accident, and that all four wheels were replaced following the accident, but that the rim used in the inspection was "the same design, same bolt pattern, [and] same flange, that's designed to fit on the Ram 2500."

He also indicated that the 9/16-inch lug nuts on the left front tire at the time of his September 2018 inspection were not the same as those installed at the time of the accident. According to Hoffpauir three of the eight 9/16-inch lug nuts on the front left tire at the time of the accident were found at the scene and were in evidence, and the remaining five lug nuts were never recovered.

Hoffpauir also testified regarding the mismatch in size between the 9/16-inch lug nuts and 14-mm studs on Romero's truck at the time of the accident. He explained that when "you drive" this "softer nut" onto the stud the first time, there is interference with the threads, and because of this interference, the lug nut can be tightened by hand for only about four threads before needing a wrench, but after the mismatched lug nut is taken off and put back on three or four times, the threads have been reformed, and the lug nut can be screwed back on by hand.

9

Hoffpauir explained that this thread interference causes "false torque," meaning it takes additional foot pounds of torque to overcome the interference of the threads; however, according to Hoffpauir, by the third or fourth time taking the lug nuts off and on, there is no longer any interference. Also, according to Hoffpauir, any interference, or false torque, in the threads would prevent the lug nuts from backing off of the stud, because, even though "they're going to be loose" the rotation of the wheel on the left side of the vehicle is "not going to overcome that interference of the threads," and "so now you're getting stud failure where you're sitting there and it's loose. . . . But you can see that the lug nuts backed off. . . . The studs did not break."

Hoffpauir testified that he examined the left front hub assembly that was on the truck at the time of the crash. He explained that the lug nuts screw onto the studs, or fasteners, sticking out of the assembly. With respect to the studs, Hoffpauir testified that the threads "were in good shape," but that the threads had aluminum in them from the aluminum wheel backing off as a result of the lug nuts backing off and the wheel becoming loose. He noted that seven of the "lug holes" were "wallowed out" and there was a lot of wear and tear. He further noted that on the eighth hole, there was no wearing because the stud was broken.

Hoffpauir also testified regarding the three 9/16-inch lug nuts found at the scene of the accident. Photographs of these lug nuts were submitted into evidence. With respect to the first lug nut, Hoffpauir explained that all the threads were there and there was no cross-threading; however, there were some "nicks in the thread" and "[y]ou can see . . . some deformation, some reforming of the threads." He also said that "even with the nicks, [this lug nut] would probably be screwed onto an M-14 by 1.5 stud[,]" but he "didn't want to force it on" because it was in evidence.

10

Hoffpauir also testified that the second lug nut "had by far the worst damage." He explained that four or five of the threads had been "pulled out[,]" but that it was stripped from "overloading" as they came off during the accident, rather than in the course of installation or tightening.

With respect to the third lug nut found at the scene, Hoffpauir testified that the threads were all there and there was no cross threading. However, there were nicks on the threads "and you can see evidence that these nine sixteenths by 18 lug nuts were forced onto a fourteen-millimeter thread."

Hoffpauir ultimately opined that the mismatch in size between the lug nuts and studs did not cause the accident. He testified:

> the threads are not the right threads, but they developed the torque. One thing that does happen, as you re-use them over and over, you have the potential for damaging the threads and . . . when you tighten up, can sense that the threads are damaged, you can't develop the torque, and you replace it then.
>
>         . . . .
>
>         . . . . So it boils down to only the left front tire was installed by Allied. . . . Allied used the circular pattern on the left front tire, and that's the only tire that came off in 6.5 miles.

When asked whether, as a professional engineer, he would recommend using mismatched lug nuts and bolts to secure a tire to a vehicle, Hoffpauir stated: "No. I wouldn't. We – as engineers, we have tested – designed those threads. We know what the threads are going to do. But I can, in this case. I believe the testing has showed that it held it on, for 200,000 miles.[2]"

---

2 There was testimony and evidence suggesting that Romero's truck was driven approximately 200,000 miles between April 2014, when the "lift kit" and 9/16-inch lug nuts were initially installed on the truck, and the third inspection in July 2020.

Hoffpauir also indicated that the reason he would not recommend using 9/16-inch lug nuts with 14-mm studs was the risk that the wheel could fall off. He further testified as follows:

> Q. Okay . . . are you telling this jury that you would look anyone of them in the eye and tell them it is fine, in your professional opinion as a mechanical engineer, for them to put nine sixteenths lug nuts on their truck that had [] fourteen-millimeter lug bolts and it would be safe for at least 200,000 miles?

> A. No. I wouldn't tell them that, as an engineer. . . . What I would look them in the eye and tell them is that this vehicle has had nine sixteenths by 18 thread lug nuts for at least 200,000 miles. There hasn't been a wheel separation except for one time, and that was 6.5 miles after it was installed with a circular pattern.

> Q. And we know that at least five lug nuts have had to be replaced on this vehicle.

> A. Yes.

With respect to the history of the 9/16-inch lug nuts on Romero's truck, Hoffpauir testified that he assumed that all thirty-two of the 9/16-inch lug nuts matched prior to the accident. He also indicated that Romero's left front wheel, tire and lug nuts were replaced after the October 2014 accident, but that he did not know where the replacement lug nuts came from or whether they were brand new.

Hoffpauir also testified that, at the time of his first inspection of the truck in March 2018, he did not know whether the 9/16-inch lug nuts on the other three wheels were the same lug nuts that were there at the time of the accident. He also indicated that sometime before his July 2020 inspection, at least five of the 9/16-inch lug nuts had been replaced and that, at some point, three properly sized 14-mm lug nuts had been installed.

Defendants' mechanical engineering expert, Dunn, also testified at trial. He concluded that the mismatch in size between the lug nuts and studs, rather than

Phillips' installation of the tire, led to the accident. Dunn opined that there was insufficient evidence upon which to conclude that "an alternating lug nut pattern" used by Phillips caused the wheel separation and accident at issue. He explained that if the wheel had been improperly installed in a cocked position to where it was not secured onto the hub correctly, the driver should have been able to feel "vibrations in the steering wheel and maybe even through the chassis itself." However, Romero testified that he did not notice anything wrong until the tire came off during the accident. Dunn also testified that while a "star pattern" is the industry standard in securing lug nuts onto the bolts of a tire, he had firsthand knowledge that in NASCAR racing, a circular pattern is used.

Dunn ultimately concluded that, more probable than not, the use of the 9/16-inch lug nuts on the 14-mm metric studs caused or contributed to the accident. He explained that the mismatch in size between the lug nuts and studs resulted in a compromise of the ability of the fastener system to attain and maintain torque and the intended pre-load, and that this weakened system was the result of either false torque and/or alterations in the threads of the mismatched lug nuts and studs from being forced together. Dunn also testified that because of the weakened fastener system caused by mismatched lug nuts and studs, "you don't know when the wheel is going to come off[,]" and, therefore, he did not recommend using lug nuts and studs that do not match in size.

Dunn demonstrated to the jury how a properly sized 14-mm lug nut was easily turned by hand onto a 14-mm stud. He also showed the jury how the threads of the 14-mm lug nut meshed with the threads of 14-mm stud so that no daylight could be seen between them. He explained that this meshing is necessary to attain the requisite interlocking connection for this type of fastener system.

Dunn also showed the jury a diagram of a 9/16-inch lug nut forced onto a 14-mm stud, which showed daylight in between the threads that were not meshed together. Dunn explained that the threads of the 9/16-inch lug nut were not designed to mesh with the threads of the 14-mm stud, and because the threads do not match, there is interference when they are forced together, and they get out of phase after about four threads.

Dunn further demonstrated to the jury how an exemplar 9/16-inch lug nut could not, after about four turns by hand, be tightened onto a 14-mm stud, but rather, required a wrench to provide additional torque. He explained that this additional torque needed to overcome the resistance of the interference between the unmatched threads of the lug nut and stud is called "false torque," because it is torque that does not actually go into stretching and pre-loading the fastener system in the way it needs to be. Therefore, according to Dunn, a person who thinks they are torquing the lug nuts to 135-foot pounds, is actually torquing it to something less than that due to the false torque.

Dunn testified that when he installed a new 9/16-inch lug nut onto a new 14-mm stud, it took 46-foot pounds of torque to overcome the interference in the threads. He stated that he took the lug nut off the stud and put it back on four times, and that the lowest measurement of additional torque (false torque) needed to overcome the interference was 22-foot pounds. Dunn disagreed with Hoffpauir's conclusion that interference, or false torque, would be completely eliminated after the third or fourth time taking the lug nut off and putting it back on. However, he explained that any decrease in interference, or false torque, would necessarily be caused by the removal of "material in that fastener system that's critical in holding it together."

Specifically, Dunn explained that the removal of material results in the widening of the lug nug and narrowing of the stud so that they lose the requisite overlap and clamping force, and the "chance of failure and yielding of the material" is increased. Dunn testified that, while he would expect the "resistance to go down a little bit, as material is removed[,] . . . that's still not a good thing. . . . and you are weakening the whole system."

Therefore, according to Dunn, the utilization of the 9/16-inch lug nuts on the 14-mm studs

> result[ed] in a compromise of the strength and therefore the performance of the fastener system . . . . for the two reasons that I've spoken about, the false torque and the fact that you are eating away or wearing away material when you put those together, because the threads don't match up, on it.

After reviewing the testimony and evidence in the record, we find that there is sufficient testimony and evidence to support the jury's finding of no liability on the part of Defendants. Defendants' expert testified that there was insufficient evidence to conclude that Phillips installed Romero's tire in a misaligned or in a cocked position, even if he tightened the lug nuts by proceeding in a circular direction around the tire, skipping every other lug nut or stud, until each was tightened. Even Plaintiffs' expert agreed that it is possible to secure the tire properly onto a rim using this pattern.

Defendants' expert also testified that, more probable than not, the use of the mismatched lug nuts and studs caused or contributed to the accident at issue, and he thoroughly explained his conclusion to the jury. Plaintiffs' own expert also testified that he did not recommend the use of mismatched lug nuts and studs due the risk of the wheel or tire coming off, but he concluded that because the mismatched lug nuts and studs had been used for over 200,000 miles since they were installed, they did

15

not cause this particular accident. However, there was evidence indicating that multiple lug nuts had been replaced since their original installation, and this supports the jury's apparent rejection of Plaintiffs' expert's conclusion.

We note that Plaintiffs have suggested in their brief that the principle of *res ipsa loquitor* should be applied to find liability on the part of Defendants because, according to Plaintiffs, "[t]here is no direct evidence that Phillips' actions/non-actions followed any common sense tire industry safety rules[,] . . . the only rim/tire Phillips touched began unscrewing with[in] a couple of miles and fell completely off in 6.5 miles[,]" and this is the only rim/tire to have come off in 200,000 miles driven with 9/16-inch lug nuts.

In *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654, 665-66 (La.1989)(internal citations omitted), on rehearing, our supreme court stated:

> [T]he doctrine of *res ipsa loquitur* (the thing speaks for itself) permits the *inference* of negligence on the part of the defendant from the circumstances surrounding the injury. The doctrine of *res ipsa loquitur* involves the simple matter of a plaintiff's using circumstantial evidence to meet the burden of proof by a preponderance of the evidence. . . .
>
> In order to utilize the doctrine of *res ipsa loquitur* the plaintiff must establish a foundation of facts on which the doctrine may be applied. The injury must be of the type which does not ordinarily occur in the absence of negligence. . . .
>
> The facts established by plaintiff must also reasonably permit the jury to discount other possible causes and to conclude it was more likely than not that the defendant's negligence caused the injury. Again, the plaintiff does not have to eliminate completely all other possible causes, but should sufficiently exclude the inference of his own responsibility or the responsibility of others besides the defendant in causing the accident.

As discussed above, there is sufficient evidence upon which to conclude that the wheel separation at issue resulted from the mismatched lug nuts and studs, rather

than Defendants' installation of the tire, and there is no indication that Defendants knew, or should have known, of the mismatch when balancing and reinstalling Romero's tire. Therefore, the record supports a finding that Plaintiffs did not sufficiently eliminate other causes of the accident, and the doctrine of *res ipsa loquitor* is not applicable.

Rather, the jury in the instant case was presented with two different theories from two different experts regarding the cause of Romero's left front tire and rim coming off of his truck while he was driving. The record supports the jury's apparent acceptance of Defendants' expert's opinion and its finding of no liability on the part of Allied and/or Phillips. Therefore, we find no merit in Plaintiffs' first assignment of error.

With respect to Plaintiffs' second assignment of error, we note that Plaintiffs have failed to set forth the applicable standard of review or otherwise present any argument in their brief concerning this issue. Therefore, in accordance with Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4), this assignment of error is deemed abandoned and will not be considered. *See Longino v. City of Oakdale*, 21-296 (La.App. 3 Cir. 11/3/21), 332 So.3d 753.

## DECREE

For the reasons set forth above, the trial court's judgment in this case is affirmed. Costs of this appeal are assessed to Plaintiffs.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

17